AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT

08/13/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____DM_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

AUG 1 3 2021

CENTRAL DISTRICT OF CALIFORNIA
BY _____Cel_____ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>ANTHONY CHAVEZ, HECTOR MERCED PARRA, and DIEGO CESAR CASILLAS<br><br>Defendants | Case No.  2:21-mj-03769-Duty-1 |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of August 12, 2021 in the county of Los Angeles in the Central District of California, the

defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute controlled substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jared Blevens*
*Complainant's signature*

Jared Blevens, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _8/13/2021_

_____
*Judge's signature*

City and state:  _Los Angeles, California_

Hon. Jacqueline Choolijan, U.S. Magistrate Judge
*Printed name and title*

AUSA: Solomon Kim (x2450)

**AFFIDAVIT**

I, Jared Blevens, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

2.   I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been so employed since January 2020.  I am currently assigned to the Los Angeles Field Division ("LAFD"), Riverside District Office ("RDO"), in Riverside, California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

3.   During the course of my employment, I have received approximately 300 hours of specialized training at the DEA Academy in Quantico, Virginia, on drug identification, detection, and interdiction; money laundering techniques; conspiracy investigations; and asset identification, seizure, and forfeiture.  During the academy, I was also trained on wire and electronic interceptions including relevant equipment.  I am certified by the California State Attorney General's Office in the practical, technical, and legal aspects of court-ordered wiretaps per California Penal Code Section 629 et seq.

4.   I have participated in drug investigations, which have included the use of confidential sources and undercover officers,

physical surveillance, electronic surveillance, the execution of search and arrest warrants, dialed number recorders (pen registers), telephone toll analysis, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and taped conversations.  Over the course of my employment as a law enforcement officer, I have participated in investigations that involve one or all of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances.  I have assisted in the execution of multiple search warrants and have spoken with defendants, confidential informants, and other witnesses who have extensive knowledge of large-scale narcotics trafficking organizations.  In addition, I have spoken with other experienced narcotics investigators concerning the methods and practices of drug traffickers.  I have also reviewed electronically intercepted communications and consulted with other law enforcement and legal personnel regarding the legal bases for the application and use of wire interceptions.

    5.    Based on my training and experience, my conversations with other law enforcement personnel, and my own participation in this investigation, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations, including drug manufacturing, drug distribution, and money laundering.  I am also aware of the tactics and methods employed by such individuals to avoid detection by law enforcement, including the use of multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit

2

calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments.  I am aware that drug traffickers drop or switch telephones and/or telephone numbers frequently to thwart law enforcement investigation of their criminal activities.  I am further aware that drug traffickers use wireless telephones subscribed in the names of other individuals, often times their spouses or other family members, to avoid law enforcement detection.  Based on my training and experience, I have found that it is common for narcotics traffickers to obtain, maintain, and use firearms in order to protect their narcotics and narcotics proceeds and that the cell phones they use have high call volume from a variety of telephone numbers.

## II. <u>PURPOSE OF AFFIDAVIT</u>

6.   This affidavit is made in support of a criminal complaint against Anthony CHAVEZ ("CHAVEZ"), Hector Merced Parra ("PARRA"), and Diego Cesar Casillas ("CASILLAS") for violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

7.   This affidavit is also made in support of an application for a warrant to search the following digital devices seized on August 12, 2021 (collectively, the "SUBJECT DEVICES"), in the custody of the DEA, in Riverside, California, as described more fully in Attachment A:

3

a.    A blue Motorola phone, model number XT20434TYPEMAE21, IMEI 352801342189755, found in CASILLAS's Lexus (SUBJECT DEVICE 1);

b.    A black iPhone 11 Pro Max in a black rubber case, found on CASILLAS's person (SUBJECT DEVICE 2);

c.    A dark blue Motorola phone, model number XT20434TYPEMAE21, IMEI 352801342688293, found in CHAVEZ's residence at 3033 Wilshire Blvd. #610, Los Angeles, California 90010 ("CHAVEZ's Residence") (SUBJECT DEVICE 3);

d.    A grey T-Mobile iPhone, with a screen protector, without a case, found in CHAVEZ's Residence (SUBJECT DEVICE 4);

e.    A blue T-Mobile iPhone, without a screen protector or case, found in CHAVEZ's Residence (SUBJECT DEVICE 5);

f.    A green iPhone with a screen protector, with a clear rubber case, found in CHAVEZ's Residence (SUBJECT DEVICE 6);

g.    A red T-Mobile iPhone with words "(PRODUCT) RED" on the back of the phone, without a case or screen protector, found in CHAVEZ's Residence (SUBJECT DEVICE 7); and

h.    A red T-Mobile iPhone with words "(PRODUCT) RED" on the back of the phone, with a clear rubber case, without a screen protector, found in CHAVEZ's Residence (SUBJECT DEVICE 8).

8.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to

4

distribute controlled substances) and 21 U.S.C. § 846
(conspiracy and attempt to distribute and possess with intent to
distribute controlled substances) (the "Subject Offenses"), as
described more fully in Attachment B.  Attachments A and B are
incorporated herein by reference.

9.     The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
search warrant, and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.    On July 15, 2021, Anthony Chavez ("CHAVEZ") sold and
delivered approximately 1,000 counterfeit Oxycodone pills to me,
a DEA agent, acting in an undercover ("UC") capacity.  Following
the deal, members of the DEA Riverside District Office ("RDO")
followed CHAVEZ back to his residence at 3033 Wilshire Blvd.
#610, Los Angeles, California 90010 ("CHAVEZ's Residence").[1]

11.    On July 30, 2021, CHAVEZ sold and delivered
approximately 2,000 counterfeit Oxycodone pills to me, again

---

[1] The pills were submitted to the Southwest Laboratory in
Vista, California on July 15, 2021, and are currently awaiting
analysis.  Based on my training and experience, and my knowledge
of the investigation, I suspect the pills contain fentanyl.

acting in a UC capacity.  RDO agents again followed CHAVEZ after the transaction, and observed him enter unit 610 specifically, CHAVEZ's Residence.[2]

1.   On August 12, 2021, members of the RDO executed a federal search warrant at CHAVEZ's Residence after viewing CHAVEZ enter his apartment with PARRA and CASILLAS.  During the search of Chavez's Residence, law enforcement seized: (1) approximately 15,000 counterfeit Oxycodone pills wrapped in cellophane; (2) an additional quantity of what appeared to be counterfeit Oxycodone pills; (3) a brick-like package of powder weighing approximately one kilogram that was packaged in a manner consistent with drug trafficking; (4) approximately 500 grams of substance that field tested positive for methamphetamine; (5) a money counter; and (6) an undetermined amount of purple powder that is suspected to be cocaine or fentanyl.[3]  A search of CHAVEZ's Residence, CASILLAS's person, and CASILLAS's car (to which CASILLAS consented) also revealed the SUBJECT DEVICES, which were seized and are currently in DEA custody.

## IV.   STATEMENT OF PROBABLE CAUSE

2.   Based on my review of law enforcement reports and records, recorded transactions, my observations during

---

[2] The pills were submitted to the Southwest Laboratory in Vista, California on July 30, 2021, and are currently awaiting analysis.  Based on my training and experience and my knowledge of the investigation, I suspect the pills contain fentanyl.

[3] The brick-like package and the purple powder were not field tested due to the possibility and associated dangers that the packages may contain fentanyl.  The substances seized from Chavez's Residence have been submitted to the DEA laboratory for further analysis.

surveillance, conversations with other law enforcement officers, and my training and experience, I learned the following:

**A.    Introduction to a Confidential Source**

3.    In July 2021, I received information from a DEA SA regarding a confidential source ("CS")[4] that had contacts with drug traffickers operating in the Southern California area. After speaking with the CS, I learned the following:

a.    The CS knew an individual near Los Angeles that, according to the CS, bought and sold large quantities of counterfeit Oxycodone and cocaine.  I spoke directly to the CS and he/she agreed to introduce me by telephone to this individual, who I later identified as CHAVEZ.

b.    The CS sent me several screenshots he/she had taken of text message conversations with CHAVEZ, as well as screenshots of CHAVEZ's social media accounts.  The screenshots showed photographs of Ziploc bags containing pills that I recognized, based on my training and experience, as counterfeit Oxycodone.  The screenshots also showed photographs of CHAVEZ, as well as brick-like packages of a substance that I recognized as cocaine based upon my training and experience.

---

[4] The CS is currently signed up with and working for the O'Fallon Police Department (O'Fallon, Illinois).  The CS also has a DEA handler in Illinois who has stated that he has proven reliable over the course or other transactions.  Throughout his/her work with O'Fallon PD, the CS has been used to initiate and prosecute cases.  The CS is working with O'Fallon Police Department due to drug-related charges, in which he is a defendant.  He has not been promised any specific benefit at this time.  The CS has the following felony convictions: conspiracy to distribute cocaine, robbery of government property, and brandishing a firearm during a crime of violence, all in 2001.

c.   On Monday, July 12, 2021, I instructed the CS to give my telephone number ending in 6255, a recorded line I used to act in an undercover ("UC") capacity, to CHAVEZ.  The CS informed me that he/she gave CHAVEZ that number and told CHAVEZ to expect a call from me.  The CS also provided a screenshot of his/her conversation with CHAVEZ showing that he/she informed CHAVEZ I would be paying $6 per pill and that I wanted a quantity of 500-1000 pills.

**B.   Undercover Conversations with CHAVEZ to Set Up First Deal**

4.   On July 12, 2021, acting in an undercover capacity, I contacted CHAVEZ from my telephone number ending with 6255.  I contacted CHAVEZ at the number the CS had provided as CHAVEZ's number.  Based on my conversation with the CS, I knew that the CS had given my undercover number to CHAVEZ and represented to CHAVEZ that I was a potential buyer of counterfeit Oxycodone and cocaine.  This was my first conversation with CHAVEZ, but I knew that it was CHAVEZ because the CS had told him to call me "Ballin Ass Jay."  During the first phone call with CHAVEZ, he asked me, "This is 'Ballin Ass Jay,' right?".  Also, I knew I was speaking with CHAVEZ because he referenced specific details about quantities and prices that the CS had told him I wanted.

5.   Between July 12, 2021, and July 15, 2021, I had several conversations and text message exchanges with CHAVEZ. This ultimately led to an agreement for CHAVEZ to deliver approximately 1,000 counterfeit Oxycodone pills at a price of $6 per pill for a total of $6,000.

6.      On July 13, 2021, I again spoke to CHAVEZ.  During
this conversation, I asked CHAVEZ if he was available to meet on
Thursday, July 15, 2021.  CHAVEZ responded, "Yes, sir.  How many
do you need?"  I told CHAVEZ I wanted the "bigger order" of what
the CS had told him I wanted.  I knew that the CS had told CHAVEZ
I wanted between 500-1000 pills so my reference to the "bigger
order" was in reference to 1000 pills.  I chose to speak to
CHAVEZ in vague terms because I know it is common for drug
traffickers to avoid using direct language that they believe is
incriminating and I wanted to represent to CHAVEZ that I was an
experienced drug trafficker.

7.      On July 14, 2021, the night before the deal was
scheduled to take place, CHAVEZ messaged me and asked for an
address where I wanted to meet.  I provided CHAVEZ with the
address of a Planet Fitness gym located at 2057 Rancho Valley
Dr., Pomona, California.  CHAVEZ told me that he needed the
address ahead of time because he planned to travel by Uber.

C.   **Conversations with and Delivery of Pills from CHAVEZ
     on July 15, 2021.**

8.      On July 15, 2021, I received a text message from
CHAVEZ in which he sent me a new address for the meeting.  The
new address was 3850 Grand Ave., Chino, California.  CHAVEZ
informed me, by text message, that he wanted to meet there
because he had to go to Party City.  I verified on the map that
there was a Party City at that location.  I replied by text
message, agreeing to meet CHAVEZ at that location.  We had
previously agreed to meet at 11:00 a.m.

9.     At approximately 10:38 a.m., CHAVEZ sent me a text message to inform me that he was about ten minutes away from the newly agreed-upon location.  I arrived at the location in a black Mercedes Benz at about 10:52 a.m. and called CHAVEZ when I arrived.  During this phone call, CHAVEZ told me that he was at Party City and that "you'll see me. I am wearing a red shirt, a backpack, and black pants."

10.     At approximately 10:54 a.m. I saw CHAVEZ walking through the parking lot near Party City and I called him on the phone so that I could direct him towards my car.  I recognized the individual as CHAVEZ from previous photos I had seen of him, and he was wearing a red shirt, a backpack, and black pants just as he had described himself.  I got out of my car and told CHAVEZ that I was wearing a blue shirt.  Once I confirmed that he saw me and was walking towards me, I ended the call.

11.     At approximately 10:55 a.m., I greeted CHAVEZ with a handshake in the parking lot.[5]  I knew it was CHAVEZ based on pictures of him that I have seen on social media, his voice, and our conversation that referenced our previous phone calls and text messages.  CHAVEZ and I both entered my car.  CHAVEZ opened a blue gift bag containing a Ziploc bag with approximately 1,000 counterfeit Oxycodone pills.  CHAVEZ told me that he knows "they're hitting right now out there," which I understood, based upon my training and experience and knowledge of the

_____

[5] At the time of the meeting and transaction, I was wearing an audio recording device, which was turned on.  Nearby DEA agents captured photos of CHAVEZ and the initial meeting.  DEA Airwing maintained and captured video surveillance of CHAVEZ during the beginning of the meeting.

10

investigation, to be a reference to the popularity and demand of the pills in the Midwest.  I know that CHAVEZ mentioned "out there" because I had told him that these pills were going to one of my buyers in the Midwest.

12.    CHAVEZ then removed a handful of the pills from the Ziploc bag to show me their quality.  I saw that the pills were cleanly pressed and were individually marked "M-30."  I know from my training and experience that this marking is a reference to the potency of a pill used by legitimate pharmaceutical companies.  CHAVEZ assured me that "they hit good, and they look good," which I understood to again be a reference to their quality.  I know from my training and experience that the counterfeit Oxycodone pills are often illegally manufactured and pressed with fentanyl.

13.    I handed CHAVEZ an envelope that contained $6,000 and told him that the money was all there and that he was free to count it if he wanted.  I opened the envelope and showed CHAVEZ that the payment was all in $100 dollar bills and told him that it was "all Benji's."  I referenced the term "Benji" as a slang term for $100 dollar bills as they contain the image of Benjamin Franklin.  CHAVEZ took the envelope and exited the car shortly thereafter.

14.    DEA investigators, with the assistance of DEA Airwing, maintained surveillance of CHAVEZ as he shopped within Bath & Bodyworks and Target.  They then observed him travel via Uber to CHAVEZ's Residence, which we later identified as the Wilshire Apartments.

15.   The pills I purchased in an undercover capacity from CHAVEZ were sent, on July 15, 2021, to the Southwest Laboratory in Vista, California for analysis and I am currently awaiting receipt of the laboratory report of that analysis.

### D.   Conversations with and Delivery of Pills from CHAVEZ on July 30, 2021.

16.   On July 21, 2021, CHAVEZ sent me a text message asking me to call him.  I called CHAVEZ; he wanted to follow up regarding the pills from the July 15, 2021, deal.  CHAVEZ asked, "what did your people say, how they look though?" and then reassured me that "the quality is good too of how it hits." CHAVEZ then asked, "when do you think you're going to need more again?"

17.   I told CHAVEZ that I would likely buy pills the following Thursday (July 29, 2021).  CHAVEZ asked if I would need the same amount or more.  We ultimately agreed that CHAVEZ would sell me 1,000 pills for $6,000 and another 1,000 pills would be loaned and an additional $6,000, which would be paid at a later date.

18.   On July 28, 2021, I contacted CHAVEZ to change the date of the deal and told CHAVEZ that, instead, I wanted to "link early Friday if that's good for u."  I used the term "link" as slang for meet.  I then told CHAVEZ that I wanted to meet "over in that same area as last time."

19.   I called CHAVEZ on the evening of July 29, 2021, to confirm that our new date for the deal was still in place for the next day, July 30.  CHAVEZ confirmed that it was.

20.    On the morning of July 30, 2021, CHAVEZ sent me a
text message asking for a specific address to complete our deal.
I told CHAVEZ that "There's a winco on the other side of the
freeway I'll post up over there somewhere" and then texted CHAVEZ
an address of "90 rio Rancho rd Pomona."  I used the term "post
up" as slang for arriving at a location and waiting.  CHAVEZ said
he would be there at about 10:30 a.m.

21.    At approximately 10:34 a.m., CHAVEZ sent me a text
message to tell me that he had arrived.  I told him I would be
there in about fifteen or twenty minutes.  He then sent me a text
message to tell me that he was "in front of the winco."  At the
same time, DEA RDO members observed CHAVEZ outside of the Winco
Foods.

22.    I arrived at Winco Foods at approximately 10:53 a.m.
and called CHAVEZ once I arrived.  I left my vehicle so I could
try to locate CHAVEZ.  Once I saw him, I directed him to where I
was within the parking lot and hung up the call when I confirmed
that he saw me.

23.    CHAVEZ walked towards me and we greeted each other
with a handshake in the parking lot.  CHAVEZ then followed me to
my vehicle and we got in.  CHAVEZ opened up his backpack and
removed a black and pink gift bag from the Mama por Dios
restaurant, which contained two Ziploc bags of 1,000 pills each.
CHAVEZ confirmed that there were 2,000 pills and I then handed
him $6,000.  CHAVEZ then left my vehicle and walked towards Winco
Foods.

13

24.     RDO agents, with the assistance of DEA Airwing, observed CHAVEZ enter a gold Honda CRV.  Based on CHAVEZ's actions from the July 15, 2021, deal, RDO agents suspected that this vehicle worked for Uber, Lyft, or another taxi or rideshare service.  Investigators maintained continuous surveillance on the CRV until it parked on the street in front of CHAVEZ's Residence.

25.     Investigators observed CHAVEZ walk from the vehicle into the Wilshire Apartment's building lobby.  Another DEA Special Agent, SA Matthews, had been waiting for CHAVEZ in the lobby, and SA Matthews walked into the elevator with CHAVEZ, where he and CHAVEZ were the only occupants.  SA Matthews then observed CHAVEZ exit the elevator on the sixth floor and turn into the hallway before entering unit 610.  Another DEA Special Agent, SA McLaughlin, entered the Wilshire Apartments shortly thereafter to photograph the lobby and the location of unit 610.

**E.     Identification of Anthony CHAVEZ**

26.     A search of (323) 448-6935 through a law enforcement database, the number for CHAVEZ passed to me by the CS, and which CHAVEZ first used when speaking to me, revealed an individual associated with that number known as Anthony CHAVEZ.  The address listed for the same individual was 7615 Walnut Dr., Los Angeles, California, and a California driver's license with number F1376009.  A query of the California Department of Motor Vehicles provided a driver's license photo of CHAVEZ.  I was able to confirm his identify based on photographs that I've seen of CHAVEZ provided by the CS, from CHAVEZ's social media, and from

my encounters with CHAVEZ.  The CS also confirmed CHAVEZ's
identity from the driver's license photograph.

**F.   Signing and Activation of Federal Warrant Providing Historic and Prospective Cell-Site Information for CHAVEZ's Phone**

27.    On July 23, 2021, the Honorable Shashi H.
Kewalramani, United States Magistrate Judge, Central District of
California, signed Order No. 5:21-MJ-00495.  The court order
authorized agents to obtain historical and prospective cell-site
information concerning the approximate location of CHAVEZ's
AT&T telephone number (323) 448-6935.

28.    On July 26, 2021, I started receiving GPS information
for CHAVEZ's cell phone number.  From that date, and through the
present date, I identified that a majority of the GPS location
pings were for latitude 34.0627 and longitude 118.2869 with an
uncertainty factor of 16m.[6]  I plotted the location on a map and
discovered that the cell phone location was in or near the 3033
Wilshire apartments, CHAVEZ's Residence.

29.    On the morning of July 30, 2021, I checked the GPS
location for CHAVEZ's phone.  Throughout the course of the
morning and up until approximately 9:30 a.m., CHAVEZ's phone was
located at or near CHAVEZ's Residence.  The GPS pings then showed
CHAVEZ traveling, until 10:18 a.m., from the area at or near the
SUBJECT PRESMISES to a location at latitude 34.0268 and longitude
-117.7712 with an uncertainty factor of 719m.  I plotted this

_____

[6] An uncertainty factor can be understood as the "margin of
error" for the location of the cell-site location information; a
smaller number for an uncertainty factor is determined to be
more accurate whereas a larger number for an uncertainty factor
is determined to be less accurate.

location and it showed CHAVEZ in the vicinity of Winco Foods
where CHAVEZ provided me with approximately 2,000 pills in
exchange for $6,000 and a commitment to pay another $6,000 later.
The GPS pings then showed defendant traveling and returning to a
location at or near CHAVEZ's Residence.

G.    **Events Leading up to and Occurring on August 12, 2021**

30.    On August 4, 2021, I made a phone call to CHAVEZ to
discuss an outstanding debt from our last deal and the details
for a future deal.  CHAVEZ assured me that he could get the
pills in whatever quantity I desired.  After our phone call, I
sent a text message to CHAVEZ to ask him about getting a better
price when purchasing in larger quantities.  CHAVEZ responded
that the price could be "5 bucks 10 plus 4bucks 20 plus."  I
understood this to mean that if I purchased more than 10,000
pills then the price would be $5 dollars per pill and if I
purchased more than 20,000 pills the price would be $4 dollars
per pill.

31.    I texted CHAVEZ the next day and told him that "i got
56 coming out. That's six for the last one and 50 for ten of
those."  This message implied to CHAVEZ that I would have
$56,000 dollars with $6,000 of that cash allotted to cover the
outstanding debt from the July 30 deal and an additional $50,000
dollars for ten thousand pills.  I knew that CHAVEZ understood
what I meant because he responded, "Sounds good bro lmk [let me
know] when u want to do it."

32.    On August 9, 2021, CHAVEZ and I spoke on the
telephone.  During the call, CHAVEZ told me he wanted to make

16

sure we were on the same page regarding quantities and asked,
"You've got fifty to spend, right?"  I understood this as CHAVEZ
confirming that I would have $50,000 dollars to buy pills in
addition to the $6,000 I had previously owed him.

33.  During the call, CHAVEZ again asked to confirm the
numbers and I explained that "you told me I was going to get
them at five dollars each, so that's ten thousand [pills]."
CHAVEZ responded that my math was correct.  CHAVEZ confirmed
that he was bringing ten thousand pills and then told me that
"I'm going to front you a couple."  I understood this to mean
that CHAVEZ would "front" or loan me several thousand pills in
addition to the ten thousand that I would pay at a later date.

34.  On August 10, 2021, the Honorable Sashi H.
Kewalramani, United States Magistrate Judge, Central District of
California, signed Order No. 5:21-MJ-00521, allowing for the
search of CHAVEZ's Residence, including any digital devices
seized therein.

35.  On August 11, 2021, I sent a text message to CHAVEZ to
tell him that I would be in the area of West Covina, California
on August 12, 2021.  I asked CHAVEZ if he wanted to meet and
complete the deal then and he responded that he did.

36.  On August 12, 2021, I messaged CHAVEZ at approximately
11:56 a.m. to confirm that he still wanted to meet.  CHAVEZ and
I agreed to meet between the hours of 1:30 and 2:00 p.m.

37.  At approximately 1:56 p.m., I called CHAVEZ because
it was near the time that we had agreed to meet.  When CHAVEZ
answered, he informed me that it was taking him longer than

17

expected because he was waiting "for the ones I'm supposed to front you." I understood this to mean that CHAVEZ was waiting on the delivery of an additional amount of pills that he would be providing me when we would meet. CHAVEZ assured me that "They're bringing them right now though, they're going to be here in like, ten minutes."

38.   Approximately 10 minutes later, at around 2:08 p.m., two DEA SAs conducting surveillance of CHAVEZ's Residence saw CHAVEZ leave his apartment and take the elevator to the lobby. At approximately 2:22 p.m., the same two DEA agents saw CHAVEZ and two other individuals, later identified as CASILLAS and PARRA, carrying a couple of small bags, enter CHAVEZ's Residence.  Within this time, CHAVEZ sent a text message to me to inform me that he was "just counting them up about to be on the way in 10." I understood CHAVEZ's message to mean that he was separating the pills into known quantities and preparing the pills for delivery.

39.   At approximately 2:25 p.m., DEA Special Response Team ("SRT") conducted a knock and announce to execute the search warrant on CHAVEZ's Residence.  Upon entry, SRT members apprehended CHAVEZ and CASILLAS, while PARRA was observed jumping off the balcony.  PARRA was subsequently apprehended and was found hiding in an outdoor location on the fifth floor of the apartment building.

40.   At the same time, an additional SRT member outside of the apartment discovered approximately 15,000 counterfeit Oxycodone pills wrapped in cellophane on the sidewalk.  This

18

package is believed to have been tossed by PARRA as he was escaping the apartment.

41.    After CHAVEZ, PARRA, and CASILLAS were detained and the area secured, all three were *Mirandized* and interviewed regarding the events that took place.  All three said that they were meeting up for lunch.  None of them provided any information or admitted knowledge of the pills found on the street or the drugs and drug-related paraphernalia found within CHAVEZ's Residence, as discussed directly below.

42.  The search of CHAVEZ's Residence revealed: (1) an additional quantity of what appeared to be counterfeit Oxycodone pills; (2) a brick-like package of powder weighing approximately one kilogram that was packaged in a manner consistent with drug trafficking; (3) approximately 500 grams of substance that field tested positive for methamphetamine; (4) a money counter; and (5) an undetermined amount of purple powder that is suspected to be cocaine or fentanyl.[7]  A search of CHAVEZ's Residence, CASILLAS's person, and CASILLAS's car (to which CASILLAS consented) also revealed the SUBJECT DEVICES, which were seized and are currently in DEA custody.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

43.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

---

[7] The brick-like package and the purple powder were not field tested due to the possibility and associated dangers that the packages may contain fentanyl.  The substances seized from Chavez's Residence have been submitted to the DEA laboratory for further analysis.

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

44.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

45.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

46.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

47.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

fingerprint scanner for approximately one second.   To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.   Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.   I do not know the passcodes of the devices likely to be found in the search.

    c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Anthony CHAVEZ's, Hector Merced PARRA's, and Diego Cesar CASILLAS's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of Anthony CHAVEZ's, Hector Merced PARRA's, and Diego Cesar CASILLAS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    d.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

24

## VII.  <u>CONCLUSION</u>

48.   For all of the reasons described above, there is probable cause to believe that CHAVEZ, PARRA, and CASILLAS have violated 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _13th_ day of
August, 2021.


THE HONORABLE JACQUELINE CHOOLIJAN
UNITED STATES MAGISTRATE JUDGE

25